BROWNSVILLE GLASS CO. v. APPERT GLASS CO. et al.

(Circuit Court, W. D. Pennsylvania. March 21, 1905.)

No. 1.

CONTRACTS—TRUSTS—ORGANIZATION.

Where a holding corporation was organized to control the patents and business of all the wire glass manufacturing companies, including defendant, and the latter received its proportion of the stock of the holding company as its share of the consideration for a transfer of patents, etc., and was entitled to be represented on the holding company's board of directors, the organization of such company, etc., constituted a "combination" within a contract by which plaintiff gave defendant a license to use certain patents in the manufacture of such glass, providing that if defendant should enter any trust, pool, combination, or trade arrangement with other manufacturers to control the output or regulate the prices of wire glass, plaintiff should be deemed beneficiary under such contract, combination, or trade arrangement.

In Equity.

John McCleave and Arthur O. Fording, for complainant.

Arthur J. Baldwin and Jas. R. Macfarlane, for Appert Glass Co. and Mississippi Glass Co.

BUFFINGTON, District Judge. This is a bill in equity, filed by the Brownsville Glass Company against the Appert Glass Company for an accounting under a contract. The Mississippi Wire Glass Company and the Mississippi Glass Company are also made parties respondent, but the controversy is wholly between the two companies first named. Prior to September 30, 1899, these two companies were competing in the manufacture and sale of wire glass. This article was made by imbedding a wire netting between two sheets of plate glass by patented processes. On that day the Brownsville Company by written contract executed by itself and all its stockholders, gave an exclusive license under

its patents, gave an option on all its stock, sold its plant and good will to the Appert Company, and stipulated, as did also all of its stockholders, that it and they would not engage in the manufacture of wire glass for five years. In consideration the Appert Company paid a present consideration of $12,500, and bound itself to pay a semiannual percentage royalty on the gross value of all the Appert Company's sales of skylight, figured-rolled, and wire glass, in the manufacture of all of which it was then engaged. In pursuance of this contract the Brownsville Company went out of business, its plant was dismantled, and its stockholders and other skilled workmen went into the employ of the Appert Company. The Appert Company continued its operations, and in pursuance of the contract paid royalty to the Brownsville Company as follows: For the first half year, ending April 9, 1900, $3,295.10; for the second half year, ending October 9, 1900, $4,027.56; for the third half year, ending April 9, 1901, $9,335.37. In addition to the Appert Company, three others, the Besto Glass Company, of Latrobe, Pa., the Mississippi Glass Company, of St. Louis, and the American Wire Glass Manufacturing Company, of Philadelphia, were in the spring of 1900 engaged in the manufacture of wire glass under patents. At that time, the Appert Company having given notice to the Besto Company it was infringing its patent, Mr. Dilworth, the president of the latter company, conceived the idea of getting the manufacturers together. The plan by which they did so was, as the latter says, an evolution. No written agreement was made between the parties, but their discussion finally culminated in the creation of a common holding company, which took assignments or control of all the patents of the consenting companies, to whom it issued stock in payment. The agreement, its purpose and effect, are stated by witnesses. Thus Mr. Dilworth says:

"The general plan of a deal of this kind is evolution. * * * It would be impossible for me now to go back and pick out step by step as it went along. * * * I was first brought in contact with Mr. Dulles by being notified that we had infringed a patent of the Appert Company. , * * * The organization of such a company as the Mississippi Glass Company [the holding one] was first suggested some time in the late fall of 1900. * * * There were a great many meetings. There was a general plan upon which the negotiations were then agreed, the ownership of the patents absolutely by the new company for a stock consideration, and the stock to be issued to the parties owning the patents who sold them. * * * The final result of this series of negotiations was the formation of the Mississippi Wire Glass Company."

He was asked as to the reasons leading to such action and the purpose in view.

"We found that the business could be conducted to better advantage and more economically with one company than with several companies. * * * We had no fixed purpose except for the companies to own those patents, and the future of the business was an unsettled problem. It was the purpose to have the wire glass trade in the hands of the proposed wire glass company so far as we could by the ownership of these patents."

The purpose of the agreement he thus sums up:

"The purpose of the proposed deal was to form a company to purchase the patents of the wire glass companies; for the purpose of making money that way, by the sale of wire glass."

The effect he thus states:

"From the time when the Mississippi Wire Glass Company took over the patents owned or held by the Appert Glass Company, the Mississippi Glass Company, the Besto Glass Company, and the American Wire Glass Manufacturing Company, until within the last three months [testimony taken February 9, 1903], there has not been any other manufacturer of wire glass in the United States, to my knowledge, that I heard of, except in an experimental way by the Encaustic. Tile Company. I don't know of any they have put on the market. Since the organization of the Mississippi Wire Glass Company there has been no wire glass sold to the trade in the United States by any other person or corporation than the Mississippi Wire Glass Company, except by the Brownsville Company, of Morgantown, who began their operations two or three months ago."

When asked as to the purpose of the formation of the Mississippi Wire Glass Company, Mr. Abbott said:

"It was organized with a view to consolidating the wire glass business, and possibly doing away with conflict in the matter of patents—rights under patents—and of effecting economies in the manufacture of that particular product."

As to its effect he states:

"I do not know of any other person or corporation in the United States that has made any wire glass for the trade, or sold any to the trade, aside from the Mississippi Glass Company and the Mississippi Wire Glass Company, between the time of the organization of the Mississippi Wire Glass Company and say the 1st of December last [1902]."

The scope of the arrangement between the parties was clearly well understood before their final meeting. Thus Mr. Baldwin, who was counsel in the negotiations for the Mississippi Wire Glass Company, the Appert Glass Company, and the Mississippi Glass Company, says:

"Contracts between the Mississippi Wire Glass Company and the Mississippi Glass Company were drawn some days prior to the meeting, and they were not changed. The contracts between the Appert Glass Company and the Mississippi Wire Glass Company were drawn by me some days prior, and were not changed. The same is true of the Besto Glass Company contract with the Mississippi Wire Glass Company. The contract between the Philadelphia parties and the Mississippi Wire Glass Company was changed. The contract with the clients of Mr. Ballard [the American Wire Glass Manufacturing Company] was changed so that the Mississippi Wire Glass Company received only a license for certain letters patent, and not an assignment; and also that the Mississippi Wire Glass Company paid a fixed royalty for the use of the patents."

Mr. Abbott, who attended the final meeting in Mr. Dilworth's place, says:

"So far as I am concerned, I had nothing whatever to do with the original negotiations. All I knew that Mr. Dilworth had decided that it would be to the advantage of the Besto Glass Company, in view of the competition that was offering, and possible complications as to patents under which we were operating, to accept the offer that had been made by the Mississippi Wire Glass Company to purchase our wire glass patents or the patents owned by the Besto Glass Company."

By the agreement between the Appert and Brownsville Companies it had been stipulated as follows:

"All of the patents owned by the Brownsville Glass Company, to-wit, letters patent of the United States No. ———— for the making of arabesque pattern glass, and all patents now applied for in the interest of the first party,

to-wit, application filed March 17, 1899, No. 709,405, for a process of manu-
facturing wire glass and all processes used by the Brownsville Glass Com-
pany, are to remain its property so far as they are its property at present;
but the Appert Glass Company, its successors and assigns, shall have license
to use all of such processes and to manufacture without limit under such pat-
ents during the said term of five years; and the royalty or bonus above pro-
vided for shall be deemed full compensation for the use of such patents and
processes during the term of this contract; and the Brownsville Glass Com-
pany or the legal owners of such patents will execute to the Appert Glass
Company, its successors and assigns, on its or their demand, such formal
license as may be necessary and proper to carry this clause into effect.
*   *   *   If, at any time within the term of this contract, the Appert Glass
Company, its successors or assigns, shall make any contract or agreement with
any other manufacturer or manufacturers of skylight, figured-rolled or wire
glass, or enter into any trust, pool, combination, or trade arrangement with
such other manufacturer or manufacturers, the purpose and effect of which
shall be directly or indirectly to regulate, control or apportion the output of
any such product in the United States, or any part thereof, or to regulate
or control the prices or sales thereof, then and in such case the Brownsville
Glass Company shall be deemed to be in right and equity a beneficiary under
such contract, agreement, trust, pool, combination or trade arrangement, so
that in its accounts with the Brownsville Glass Company the Appert Glass
Company shall be deemed to have manufactured and sold thereunder so much,
and only so much, of the glass produced by parties hereto as shall be repre-
sented by the Appert Glass Company's share of profits under such contract or
other arrangement."

The case turns on the question whether this arrangement, which was
consummated by the formation of the Mississippi Wire Glass Company,
was one embraced by the terms of the thirteenth article, or, in other
words, did the Appert Glass Company thereby make any arrange-
ment with any other manufacturer of wire glass, or enter any com-
bination or trade arrangement with such other manufacturers, the
purpose or effect of which shall be directly or indirectly to control
such product in the United States?   In taking up that question, we
must not be misled by words and names.   It is contended that the
patent was sold to the Mississippi Wire Glass Company, and it was
paid for in stock; but this is to lose sight of substance.   It is true
the patent was sold to the holding company, but the Appert Com-
pany, by such form of sale, became the owner of one-fourth of that
company, held a directorship in it, and was entitled to participate
in its profits.   Thereafter the holding company issued licenses un-
der its patents to the Mississippi Glass Company.   What the con-
tract between these two was, whether it provided for a fixed rental
or a royalty on the wire glass manufactured, is not in evidence;
but that in some way the holding company profited by the manu-
facture of glass under these patents, and thereby earned the profits
to pay its dividends, is clear.   That the transaction was a combination
with other manufacturers, and that the Appert Company was, by these
agencies, continuing in the glass business, and was not abandoning the
business as stipulated by the sixteenth article, is shown not only by its
ownership of the stock, but by the references to the transaction in the
minutes of the Appert Company.   Thus in the minutes of November
22, 1901, we find the following:

"The president acquainted the board of some negotiations with the Besto
& Mississippi Glass Companies by which it was proposed that a company be

formed controlling all the wire glass patents issued to them and that the part of this Company would amount to 24½ per cent. of the capital of the wire glass company which would net a dividend to this company per year of at least $25,000. This arrangement would also bring, when consummated, another in regard to skylight glass and the possibility was that this company would lease the factory to the Mississippi Glass Company, which would bring a good revenue to this company, say $25,000. The president figured that the company would out of the arrangement be sure of getting $50,000 a year clear revenue."

### The meeting of December 18, 1900, shows:

"The president reported his negotiations with the proposed wire glass combination, saying that everything was going satisfactorily to him; the proposed percentages were 31 per cent. for the Mississippi Glass Company, 20 per cent. for the American Wire Glass Company, plus a guaranty of $10,000 a year, 24½ per cent. for the Besto Glass Company, and 24½ per cent. for our company. The $10,000 guaranty brought a good deal of discussion, although the president explained that the said guaranty would be paid by the Mississippi Glass Company, and in the event it was paid by the wire glass company then our company would receive 2 per cent. additional, so that we would receive 25½ per cent. and the Besto Company also 25½ per cent., thus giving both companies the practical control. This additional percentage, the president said, was well worth the $10,000 per year guaranty. The directors, however, objected to agreeing to any such payment, and the president said it was imposed by Messrs. Elkin and Latta, the original owners of the Shuman patent, and on which they now receive $10,000 a year royalties. This, these gentlemen did not want to lose and insisted on it before agreeing to anything. Then the president represented that he had agreed with Messrs. Dilworth and Humphreys to the first condition so that the combination took place on the first of the new year. The directors questioned the president in regard to what had been agreed as to organization, salaries, etc., etc., to which he answered in details. The president said that the payment of $10,000 was demanded for until the expiration of the patent and not for the life of the company, otherwise it would not be considered. The directors recommended that a further explanation on this point should be had and a limitation fixed, or an option given for one or two years for buying the patent at a price fixed in advance. The president realized, he said, the difficulties involved in the equitable distribution of the four companies' rights, and asked the board to name a committee to assist him in his negotiations. No decision was taken, however, the directors saying that the president knew their objections to the proposed agreement and would await his report to the board on the final conclusions. The president stated that the wire glass combination would bring another, that of the skylight glass, and the leasing of the factory to the Mississippi Glass Company for a good rental which would net us thirty thousand a year, the rental to be with option to buy. On motion, seconded, it was resolved, that the plans of the president regarding the leasing of the factory were desirable and authorized him to rent it at a remunerative advantage to our company."

### That of January 30, 1900, shows the Appert Company was looking to the profits in the holding company as the source from which its own dividends would be paid. Thus:

"The president reported in detail the negotiations with the proposed new wire glass company, and that they, so far, were progressing satisfactorily; that our counsel had framed the charter and by-laws for the new company, which will be at the capital of $1,500,000, and will be organized under the laws of the state of New Jersey; that the company will begin business on the 15th day of February, 1901. * * * The president then read the proposed lease of our factory to the Mississippi Glass Company, drawn by our attorneys, and made statements which demonstrated the advantage for this company to rent its factory, which rental, with the share of profit in the new wire glass company, would insure the payment of the interest on the preferred stock of the company, instead of risking, in running the factory, a reduction in the price

of rough and ribbed glass which would risk profits to the stockholders. The president said that the rental of the factory would bring $25,000 yearly, without including the expense for insurance, taxes, etc., etc., but that the Mississippi Glass Company would make enlargements and that such enlargements would become our property at the expiration of the lease; with the lease the option to buy the plant for $150,000 would have to be given."

In our judgment, it is clear the Appert Company did enter into an agreement with other manufacturers of wire glass of the character mentioned in the thirteenth article. Was it a combination? That is defined by the Century Dictionary as "the union or association of two or more persons or parties for the attainment of some common end." That such was the case here is clear. That a common end was sought, and that such common end was accomplished by the medium of a holding company, is apparent. As Mr. Dilworth very frankly says: "I was not present at the final meeting, but, as the company was formed, I take it for granted there was some agreement immediately before the formation of the company." In the first place, wire glass was a patented article, or rather was made by processes covered by patents. Now, when the owners combined those controlling patents in a common company, it requires no arguments to convince the business mind that these manufacturers had made a most effective combination with each other, the purpose and effect of which was to regulate and control sale and price. The new company was but the insrument by which that end was accomplished. The constituent companies were, through ownership of the holding company's stock, and their severally apportioned directors, its owner. The holding company was but the agent through which they carried out their purpose of combining their interests and continuing their several competitive businesses in one combined harmonious whole. And in that business each constituent company retained and received its share of the profits through the medium of a proportionate ownership of its stock. The mere fact that the combination of interests took the form of a corporation, and the patents were sold to it, is not important, for the test is, what was the ultimate object in view, not the means by which it was done. If these patents had been vested in one or more trustees to hold for the benefit of the patent-owning companies, no one could say that such companies had not agreed or combined for a common purpose. Now that the holding agency here took the form of a corporation, instead of a trusteeship by individuals, does not change or affect the ultimate purpose. In one case the constituent companies exercise ownership and control as beneficiaries under a trust; in the other through the medium of agreed-upon percentages of stock in a common company. After careful consideration, we are of opinion this combination came within the letter and the spirit of the thirteenth section of this contract. The contract of the Appert Company resulted in putting the Brownsville Company out of business. The sixteenth clause was evidently inserted for the benefit of the latter company, and was in a general way intended to allow it to enter business in case the Appert Company went out of business. But this contingency did not arise. While the Appert Company ceased manufacturing, it did not go out of business, but retained its interest by the agency of stock ownership in a common holding company. It

now seeks to use the forfeiture provisions to escape liability for this royalty. So far as the Appert Company is concerned, it is clear that one of the offices it had in view in using the agency of a common holding company to carry out its purposes of effecting a combination with other manufacturers was to escape liability for this royalty. This we are of opinion it cannot do.

A decree for an accounting may be prepared.